FOSTER, MILBURN & COMPANY vs. THE BLOOD BALM COM-
PANY et al.

1. A label bearing the names of the proprietors, the name of their medicine and of their place of business, the names of various diseases, etc., and taking distinctive character chiefly from a device consisting of a letter of the alphabet nine times repeated, the repetitions being arranged in three vertical columns separated by lines or bars, so as to form three groups of three B's (B. B. B.), and when applied to the goods, presenting to the eye on each of three sides of the package this triple combination of the letter, in conspicuous type, may, by actual use in commerce, become such a badge of origin and ownership of goods as to be the subject of protection against any colorable imitation likely to deceive the public and injure the proprietors in their trade.

2. But a preliminary injunction should not be granted, all questions of fact involved being for determination by a jury, and there being no irreparable mischief likely to ensue from awaiting a verdict and final decree thereon.

March 5, 1887.

Trade-Marks. Labels. Injunction. Before Judge MAR-
SHALL J. CLARKE. Fulton Superior Court. September
Term, 1886.

On February 20, 1886, Foster, Milburn & Company filed their bill against the Blood Balm Company et al., alleging, in brief, as follows: In 1881, Thomas Milburn & Co. were

residing and doing business in Toronto, Canada. They manufactured and sold certain bitters and adopted for their use a trade-mark, which they had registered in the patent office at Washington, D. C. Cotemporaneously with its adoption, they invented and adopted as a vehicle and part of it a printed wrapper. They have used this trade-mark and wrapper continuously in their business since 1880, and have acquired a title thereto at common law. It has been their practice to print this trade-mark on paper wrappers, and then secure them to the package containing the bitters or box containing the bottle. On February 16, 1884, the owners of this trade-mark and wrapper formed, with others, the firm of complainants, who do business in various parts of the United States, having their principal office at Buffalo, N. Y. By the terms of this partnership, they acquired and now have the right to the exclusive use of the trade-mark in the United States in the manufacture and sale of the class of merchandise to which it has been appropriated. Since that time they have manufactured and sold bitters under that trade-mark and wrapper throughout the United States, and the medicine is held in high estimation by the public, and complainants have derived a large revenue therefrom. About June 25, 1884, the natural persons who are defendants to the bill began manufacturing a medicine given out by them as a remedy for blood complaints at Atlanta, Georgia, and sales of it were made at many places in the United States. Subsequently, they formed a corporation, known as the Blood Balm Company, and the manufacture and sale has been continued by it since December 19, 1885. This medicine has been and is being enclosed in a paper box or wrapper bearing a counterfeit mark greatly resembling that of complainants.

Immediately upon adopting their trade-mark and wrapper, Thos. Milburn & Co. affixed it to every one of their bottles of bitters and so sold them, while the trade-mark became known to the trade and to all persons buying the medicine as the peculiar marks and designation of the

bitters; and since complainants' firm was organized, they have continued such use and sale, and they claim the exclusive right to use such trade-mark and wrapper for the bitters. · They assert that the following similarities exist between their trade-mark and wrapper and the wrapper of defendants: In each wrapper large B's are the most prominent features; on each they are black, and are brought out by red and white in proximity; in each there are three columns of B's, each column containing three B's; in each wrapper three rows of B's run across the sheet, and three run down, making the same in number, that is, nine in each, the B's in each being collocated in the same vertical and horizontal order; the B's in the middle column of defendant's wrappers and the B's in each column of the complainants' are inscribed, with the assertion of what the medicine cures, in white letters; in each wrapper every B is the initial of a particular word in a name of a medicine consisting of three words; the colors, red, black and white, are contrasted conspicuously in each and in a similar manner; the wrapper of defendants says the medicine cures itching, humors, hereditary taint, impure blood, boils, pimples, eruption, and plaintiffs' wrapper essentially the same, using other synonymous words, except pimples; the medicines covered by each wrapper are blood-medicines; both are put in bottles, the price stated at the bottom of each being the same; on each wrapper the proprietary name is in the same relative place and the expression of the name similar.

In view of these similarities, the wrapper of defendants must have been fraudulently copied from the trade-mark and wrapper of complainants. At any rate, complainants claim the exclusive right to use such trade-mark and wrapper. Large quantities of the medicine manufactured by defendants have been and are being, by them or by their contrivance, offered for sale and actually sold to druggists and others in the United States and passed off to people for genuine articles of complainants' manufacture.

Defendants have made large profits from this source, for which they should account.

Discovery was waived. The prayers were for injunction, account, recovery of damages, *subpœna* and general relief.

The complainants amended their bill, alleging, in brief, as follows: When the original bill was filed, they had not discovered that their trade-mark, as registered, claimed for them "B. B." instead of "B. B. B.;" that the failure to insert the third B was probably due to the misunderstanding of their agent in Washington or some inadvertence. From the very first use of the trade-mark and wrapper, complainants designated the medicine as B. B. B.; and it became so known to the trade, and purchasers commonly ordered it by that name. Such designation belongs to complainants' bottles alone and is a part of their trade-mark and wrapper. Defendants are proceeding to sell the Botanic Blood Balm in various parts of the United States under the name of B. B. B., and are actively competing with complainants in the region where their bitters are mainly sold, and by reason of the identity of the designation of the two medicines, orders to druggists and dealers for the medicine of complainants may very probably be filled by delivering the medicine of defendants. Injunction to restrain the use by defendants of the name B. B. B. and the trade-mark and wrapper was prayed.

The Blood Balm Company answered the bill, in brief, as follows: It was incorporated December 19, 1885, and is engaged in the manufacture and sale of the medicine known as Botanic Blood Balm and also as B. B. B. It alone has the right to manufacture that medicine and sell it, except in cases where it has conferred the right of sale upon dealers purchasing from it. It denies that its medicine is put up or sold in a paper box or wrapper which is a counterfeit of the package used by complainants, or that it has copied or counterfeited the trade-mark of complainants, or that its trade-mark is identical with that of complainants or bears such resemblances to it as to be calcu-

lated to deceive, or that there was any intention to copy or counterfeit the trade-mark of complainants or the appearance of their package, or to gain any advantage by such supposed resemblance. The markets in which the two medicines are sold are widely distant, and the medicine of complainants was practically unknown in the market where defendants offered their medicine. The name of Botanic Blood Balm was selected without any knowledge of complainants or their medicine, and was so selected because it justly represented the quality and purpose of defendants' medicine. At the time Thos. Milburn & Co. applied for the registration of their trade-mark, it was stated to be the design on one side of the bottle or box containing the medicine, and not the entire wrapper, as would be inferred from the bill. At that time, Thos. Milburn & Co. declared in their application to the patent office that the trade-mark consisted of the letters " B. B.,"· arranged in shields, forming the words, " Burdock Bitters," and that the essential features of the mark were the letters, " B. B.," arranged in such shields. Complainants are bound by their solemn declaration, publicly registered, of what their trade-mark was; and defendants' cartoon and trade-mark were selected in good faith and upon the belief that it was no infringement; and defendant has spent large sums of money in advertising the medicine and introducing it as it is known by its name and by the appearance of the wrappers containing it. This has continued since 1883. On February 1, 1886, defendant applied to the patent office to have its trade-mark registered, and after comparison with that of the Burdock Bitters, it was decided by the commissioner of patents that defendant was entitled to such registration, notwithstanding that of the complainants, and that there was no infringement on the latter. Defendant's medicine has not been offered or sold as the goods of complainants, nor has there been any desire, intention or attempt so to do, nor have the medicines been taken for each other in the markets where both have been

offered for sale.   The following points of dissimilarity between the two wrappers are to be noted :

The general appearance of defendant's wrapper is red; that of complainants, gray.   The letters B on respondent's wrapper are in white panels ; on complainants, they are upon shields, of which one-third is white and the balance gray and red.   Defendant's wrapper has no gray on it, while gray is the prevailing color of complainants'. The cartoon of defendant's wrapper comprises but three sides of the box containing the bottle ; that on complainants' wrapper comprises all four sides of the box.   With defendant's wrapper, the fourth side, being the one not included in the cartoon or trade-mark, is white, usually having printed thereon some advertisement, or words in praise of the medicine contained, while with the wrapper of complainants this fourth side is really the chief one—is of a gray color, having thereon printed, up and down the bottle, the words, "Burdock Bitters," with the word "Blood" in a scroll between the two words.   The size of defendant's bottle is about double the size of the complainants' bottle, and the boxes or packages, when put up in the wrappers, bear the same proportion to each other as the bottles.   With defendant's wrapper the three large letters "B." on the front or middle side  are placed in white panels in such a way as to cover about half of the panel, leaving room at the right thereof in each instance for lettering and words ; with the wrapper of complainants each "B." is upon a shield, the "B." covering almost the entire shield, and having no lettering on the shield, outside of the letter "B."   The B's on the two narrow sides on defendant's wrapper have no letters upon them at all, while the B's on the narrow sides of complainants' wrapper have divers words and phrases printed in prominent white letters.   The wrapper of defendant claims that the medicine it contains will cure syphilis ; while the wrapper of complainants makes no such claim.   Defendant's wrapper also claims to cure itching humors, hereditary taint, blood poison, skin

diseases; none of which are alluded to on complainants' wrapper. On defendant's wrapper are words and letter-ing printed on the red, which is the prevailing color, while on the complainants' wrapper there is very little red, and what little red there is contains no lettering whatever. On defendant's wrapper, the proprietary name is printed in Roman letters, while on complainants' wrapper, it is printed in script, apparently in imitation of the signa-ture of complainants' firm. On defendant's wrapper, the price is stated in small black letters on a red field, just below the proprietary name, while on complainant's wrapper, the price is in white capital letters on each of the two narrow sides, at the bottom, upon a black field. The design of defendant's wrapper is printed directly upon the pasteboard box itself, while the design of complainants' wrapper is printed upon paper, and then folded around the pasteboard box.

Complainants have shifted their ground and the nature of their complaint several times, beginning with the alle-gation that B. B. was a distinctive feature of their trade-mark in connection with their wrapper. They amended the bill several times, finally withdrawing the claim for in-junction and subsequently renewing it. Complainants' medicine was never known as B. B. B., but was known to the trade as Burdock Blood Bitters and sometimes as Bur-dock Bitters. Defendants have learned that complainants have, within the last two years, begun to use B. B. B. to designate their medicine, but they never did so until the medicine of defendant acquired great celebrity. Defend-ant has the exclusive right to use that name, and its use by complainants is a fraud. By way of cross-bill, it was prayed that complainants be enjoined from the further use of the name B. B. B. in connection with their medicine, and that they be not allowed to dismiss their bill until this relief shall be accorded to the defendant.

The evidence in support of the bill and answer was voluminous, but need not be set out in detail. On the

hearing, the chancellor refused the injunction, and the complainants excepted.

REED, REINHARDT & O'NEILL; HOPKINS & GLENN, for plaintiffs in error.

HILLYER & BRO., for defendants.

BLECKLEY, Chief Justice.

In the element of registered trade-mark, the case made by the complainants is a total failure. They had, and still have, a registered mark, but that has never, in any way, been encroached upon by the defendants. The registration has proved unfortunate, rather than happy, for it has even become a surprise to the complainants themselves, besides tending, perhaps, to mislead the defendants. The complainants now suggest that their true and correct trade-mark was not registered, but that by mistake something else was substituted. This is enough to embarrass them, considering that the registration was founded on oath, and was attended with a printed *fac simile* and a thoroughly minute description in words of the mark submitted for registration. A mistake, even in so solemn and deliberate a proceeding, might occur; but whether it did or not, the record stands as originally made, and it is certain that unless the complainants can have more than one trade-mark for the same class of goods, or unless a trade-mark may consist in part of matter registered and in part of matter not registered, their trade-mark has not been tampered with. The registered mark has been continuously used by them since the registration, as well as before. They affix it to each and every package of their goods, but they use it always in connection with the other three sides of their label, the registered matter constituting the fourth side. As to whether one person or firm can appropriate two or more trade-marks for the same goods in the same commerce, one registered and the other not, we are not

prepared to say. The books, so far as we are acquainted with them, furnish no instance of such double marks; and if there can be two, we see no reason why there may not be twenty. Neither will we now say whether a mark registered as a whole can be treated as but part of a trademark, when used in combination with another material part not registered. It is probable that the act of congress, properly construed, confers no authority for registering less than the whole of any mark on which the applicant for registration intends to rely in subsequently using the registered matter affixed to his merchandise. There is good reason for not opening the public registry to mere scraps and fragments of a trade symbol. If the flag is to consist of stars and stripes, the device is neither one nor the other, but both together, and both should appear in the Herald's book. We, however, mention these points only to pass them, not to decide them. The case before us does not rest solely, nor even chiefly, on the strict trade-mark element, but on the analogous element of label or wrapper.

Conceding that the complainants' trade-mark is confined to the fourth side of their wrapper, a side which the defendants have in no way touched, the question is, are the other three sides, each of them more loud to the public eye than is the fourth, such a label, or such parts of a label, as a court of equity can and will protect against unfair infringement? The prior use of this label by the complainants is clearly established, and the manner of its use has been such as to give them as strong a right as is capable of arising in respect to any label of its class. How to classify it is the sole difficulty on this branch of the case.

It bears the names of the proprietors, the name of their medicine and of their place of business, the names of various diseases, etc., and is characterized by a device consisting chiefly of a letter of the alphabet nine times repeated, the repetitions being arranged in three vertical columns, separated by lines or bars, so as to form three groups of three B's (B. B. B.), and when applied to the goods, each of three

sides of the package presents to the eye one of these triple combinations of B in conspicuous type. There are other features, but these are the most important in the present controversy.

The name of complainants' medicine is Burdock Blood Bitters, and this gives rise to the suggestion that the three B's on the label are used descriptively of the medicine, being the initials of the three words constituting this name. Moreover, as all the words are generic terms belonging to the language, the usual distinction between the appropriation of these in their literal sense, and words arbitrary or specific, is also suggested. A further suggestion is that B is merely a letter of the common alphabet, and being such, it is the property of the world and incapable of appropriation to the exclusive use of anybody. These considerations would, perhaps, all be pertinent were it not for the distinction between a trade-mark in its technical character, and a *quasi* trade-mark, such as a label or wrapper. It is not quite certain that, even as a technical trade-mark, nine B's distributed into groups of three each, arranged in a given order, and placed in colored frames or settings, would not be sufficiently fanciful and arbitrary to be ligitimate. There is no possible device or design which does not consist in its elements of something which is common to the whole world when it comes to be represented to the eye. Combination and arrangement of some such elements underlie all individuality and all difference. If nine letters, collocated so as to form a new word, will become a symbol, it may be difficult to say why the same letters, or one of them nine times repeated, may not be so arranged and combined as to form, with certain accessory lines enclosing them, a symbolic tableau. Such a device, it might be, would serve not only as a commercial emblem, but as the distinctive standard of a nation. Indeed, it may be doubtful if the flag of our own country would be more easy of recognition amongst other national ensigns than would

be this label amongst most other labels of proprietary medicines.

But whether the design would suffice or not for a technical trade-mark, there can be no reasonable doubt that it is sufficient for a label; for, taken in connection with the proprietors' names, the name of their place of business, and the name of their medicine, all of which appear upon it, it is an appropriate indication of the origin and ownership of their goods; and if others, for goods of the same class, have imitated the main features of it so closely as that the imitation is likely to mislead the average public and betray purchasers into ordering goods covered by the simulated label, thinking them to be those put on the market by the complainants, this would amount to unfair competition in trade, and upon being ascertained with due certainty, the use of the imitation ought to be enjoined.

2. We are, however, satisfied that, in this case, the injunction, if to be granted at all, ought to await the result of a trial upon the merits. It is a grave matter to petrify in an instant a living business by a mere interlocutory order. If the use of a particular label is important to the complainants, so is it to the defendants. And, at last, the facts have to be found by a jury; the chancellor, under our system, has no power to settle them in vacation or even in term. Any injunction which he, unaided by a jury, could grant would be only a temporary expedient. It would prevent neither the delay nor the expense of a jury trial. At that trial, it will be for the jury to say by their verdict, not only whether the label used by the defendants resembles the complainants', but whether the imitation is such as to deceive, and whether its use, if continued, will probably have that result. Divers other questions of fact, if the pleadings retain their present shape, will come before the jury for full and final ascertainment. It is not shown that the defendants are insolvent, or that for any cause the denial of a preliminary injunction will produce irreparable damage. There would

be much more danger of such damage to the defendants from a mistaken grant of an injunction at this stage of the proceedings than there is to the complainants from the refusal to grant it. We think the judge below acted wisely and prudently in forbearing to interfere. He not only exercised a sound discretion, but, so far as we can discern, made a perfectly accurate decision—the very one he ought to have made.

As we affirm the judgment, we forbear to express, or even to intimate, an opinion as to whether the defendant's label is or is not piratical. At bottom, that question is one of fact rather than of law, and we leave it to the appropriate tribunal.

Instead of quoting authorities in detail for the points we have glanced at, as well as those decided in the course of this opinion, we refer generally to Browne on Trade-Marks, 2d edition, and the numerous citations which that work contains, both in the text and the notes. See also Myer's Federal Decisions, vol. 25, title Trade-Marks.

Judgment affirmed.