ANARGYROS & CO. v. ANARGYROS.†

(Circuit Court of Appeals, Ninth Circuit. February 1, 1909.)

No. 1,587.

1. INJUNCTION (§ 137*)—PRELIMINARY INJUNCTION—GROUNDS FOR DENIAL—RIGHTS IN DOUBT.

It is a well-established rule in equity that a preliminary injunction should not be granted in a doubtful case.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 309; Dec. Dig. § 137.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 95*)—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION.

The right of a complainant to a preliminary injunction to restrain alleged infringement of a trade-mark *held* so doubtful on the proofs as to require the denial of such relief.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 108; Dec. Dig. § 95.*]

Appeal from the Circuit Court of the United States for the Northern District of California.

This appeal is from an order granting a preliminary injunction.

The bill alleges, among other things, that prior to March 30, 1900, and for more than 10 years next preceding that date, one S. Anargyros was engaged in the business of manufacturing and selling cigarettes in the city of New York; that all of the cigarettes so manufactured and sold by the said S. Anargyros bore his name, and were packed and inclosed in packages or boxes which were marked with the name "S. Anargyros"; that the said S. Anargyros continued to carry on said business, which was large and lucrative, in the said city, until the month of March, 1900, when he conveyed his entire interest in the business, including the good will of the same, and the trade-name or trade-mark "S. Anargyros," and the exclusive right to the use of the same, to the complainant, and retired therefrom, whereupon the complainant became the legal and equitable owner thereof; that prior and up to the time of such conveyance those cigarettes had become known generally throughout the markets of the world as "Anargyros" cigarettes, and that the name S. Anargyros had become a trade-mark or sign of quality of the said cigarettes so marked, and to indicate the ownership and origin thereof as a product of S. Anargyros, manufacturer, and to distinguish the said cigarettes from those of other manufacturers, and had become and was a valuable and integral part of the boxes, packages, and trade-marks in and under which the said cigarettes had been sold by the said S. Anargyros.

The bill further alleges "that, at or immediately before the time of the completion of the purchase of said business of S. Anargyros by your orator, as aforesaid, the incorporators of your orator conceived that the name 'S. Anargyros' was a valuable and integral part of the packages and boxes in which, and of the trade labels and trade-marks under which, said cigarettes had been sold, and on that account caused the organization of said corporation under the name 'S. Anargyros' as aforesaid; that ever since the said 30th day of March, A. D. 1900, your orator has conducted and carried on said business so acquired from the said S. Anargyros, in said city of New York, state of New York, and has been, and still is, the sole owner and proprietor thereof, and has large capital invested in said business; that during all of such time your orator, as successor of S. Anargyros, has made it

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

167 F.—48          † Rehearing denied March 2, 1909.

an especial business to manufacture and sell, and during all of said time has manufactured and sold, and is now manufacturing and selling, cigarettes to be distributed and sold, and which are distributed and sold, in most, if not all, of the markets throughout the world, under the trade-name or trade-mark 'S. Anargyros';" that the cigarettes so manufactured and sold under said trade-name or trade-mark by the said S. Anargyros and the complainant are of a superior quality, and have achieved a great and valuable reputation among the cigarette trade and purchasers of cigarettes throughout the world, which is of great value to the complainant, and will continue to be so, if the alleged wrongful imitation, simulation, and infringement of the same by the defendant be restrained and enjoined; that the cigarettes so manufactured and sold by the complainant are marked, packed, and sold under several different labels to distinguish them from others, which several brands are designated by the respective and distinctive names "Egyptian Deities," "Mogul," "Murad," "Turkish Trophies," and "Windsor Castle," in addition to the common trade-name or trade-mark "S. Anargyros," which said last-mentioned trade-name or trade-mark is plainly printed upon each and every cigarette put up and sold under the respective brands, and upon each and every package or box containing the same, and which said respective brands are set out in the bill as follows:

[Originals were printed in various colors.]

[Original was printed in various colors.]

[Originals were printed in various colors.]

The bill further alleges that while the complainant has had the sole and exclusive right to the use of said name "S. Anargyros" as a trade-name or trade-mark, the defendant has manufactured and sold, and is now manufacturing and selling, large quantities of cigarettes, upon each of which, and upon the packages and boxes containing the same, it has placed, and is now placing, in plain and conspicuous letters, the name "Anargyros & Co." in imitation of the name "S. Anargyros," as it has been heretofore used by the complainant and the said S. Anargyros, as already stated; that the defendant has put up, and is putting up and packing, the cigarettes so manufactured and marked by the defendant as aforesaid, in boxes and packages in shape and size similar to the boxes and packages in which the cigarettes manufactured by the complainant are put up and packed, and that the defendant has used, and is now using, upon the packages and boxes in which its cigarettes have been and are being put up and packed, trade-marks and trade labels simulating, imitating, and infringing the aforesaid labels and trade-marks of the complainant; that upon the packages and boxes containing cigarettes of a brand described and designated by the defendant as "Egyptian Nemesis," in simulation and imitation of the complainant's brand "Egyptian Deities," the defendant has caused to be placed the following trade label or trade-mark:

[Original was printed in various colors.]

That upon the packages and boxes containing cigarettes of a brand described and designated by the defendant as "Turkish Pets," in simulation and imitation of the complainant's brand "Turkish Trophies," the defendant has caused to be placed the following trade label or trade-mark:

[Original was printed in colors.]

That the cigarettes so manufactured and sold by the defendant, and having said name "Anargyros & Co." upon them as aforesaid, were and are of a quality very much inferior to those manufactured and sold by the complainant, by all of which acts the complainant alleges it has been greatly damaged.

The bill was verified by the president of the complainant corporation, in which verification it is stated that he knows the contents thereof, and "that the same is true of his own knowledge, except as to matters therein stated on information and belief, and that as to those matters he believes the same to be true."

Accompanying and in support of the bill, the complainant filed the affidavits of George W. Whitaker, E. C. Hull, George W. Little, W. R. Elliott, Jr., R. A. Laherty, Robert Dumphy, and William Quincy.

Whitaker in his affidavit states that he is the vice president of the John Bollman Company, a corporation, which is the distributor of the cigarettes manufactured by the complainant, within the states of California, Oregon, Washington, Arizona, the western portions of Idaho and Nevada, and the Hawaiian Islands; that there is no officer of the complainant residing in the state of California, and that the affiant has been authorized by the complainant to employ counsel to commence suit, and to take any and all steps necessary to the successful prosecution thereof; that, acting under such authority and for that purpose, he procured the affidavits of Hull, Little, Elliott, Laherty, Dumphy, and Quincy, in support of the allegations contained in the bill, and that no officer of the complainant has, nor has the affiant, any personal knowledge of the facts set forth in those affidavits, each of which affidavits he caused to be filed with the bill in support thereof, and of the complainant's application for a restraining order and preliminary injunction.

The affidavit of Hull is to the effect that he is a sales agent of the John Bollman Company, a corporation engaged in the manufacture and sale of cigarettes, and that on or about the 6th day of December, 1907, he called at the cigar stand of one Harris, in San Francisco, and said to Harris, "I see you have a new cigarette," pointing to a lot of "Turkish Pets" cigarettes upon one of the shelves of his stand, which cigarettes are manufactured and sold by the defendant, and that in reply to affiant's remark Harris stated: "Yes.; it is an Anargyros cigarette, made by the same people that make 'Turkish Trophies.'"

The affidavit of Little is to the effect that on the 19th day of November, 1907, he called at the cigar stand of one Morris, in the city of Oakland, and asked the attendant for a "package of Anargyros 25-cent cigarettes," and that the said attendant thereupon handed to him a package of "Egyptian Nemesis" cigarettes.

The affidavit of Elliott is to the effect that he was engaged in the retail cigar and cigarette business in San Francisco, and received on consignment a lot of "Turkish Pets" cigarettes from the defendant, and that the defendant's salesman who took the affiant's order therefor informed him that Anargyros, of the defendant company, was formerly a partner of S. Anargyros, and had formerly made "Turkish Trophies" cigarettes; that affiant ordered said cigarettes of the defendant relying on that statement, and upon the fact that the name of the manufacturer of said "Turkish Pets" was similar to that of the manufacturers of "Turkish Trophies"; that the price of "Turkish Pets" cigarettes is much lower than that of "Turkish Trophies," and that affiant intends to sell said "Turkish Pets" in place of and for "Turkish Trophies" cigarettes.

The affidavit of Laherty is to the effect that on the 6th day of December, 1907, he called at the cigar stores of Hermann Keiser, W. R. Elliott, and of Chambers & Wieman, in the city of San Francisco, and laid upon the counter of each of those places a 10-cent piece, at the same time asking the respective attendants in charge for a package of "Anargyros Cigarettes," and that each of the attendants thereupon delivered to the affiant a package of "Turkish Pets" cigarettes.

The affidavit of Dumphy is to the effect that on the 7th day of December, 1907, he called at the cigar stands of Hermann Keiser, and of Lazarus &

Marish, San Francisco, and laid upon the counter of each of those places the sum of 25 cents, at the time asking the attendant in charge for a package of Anargyros cork-tip cigarettes, whereupon the respective attendants delivered to the affiant a package of "Egyptian Nemesis" cigarettes.

The affidavit of Quincy is to the effect that on or about November 18, 1907, he called at the cigar stand of one Morris, in the city of Oakland, and laid upon his counter 25 cents, at the time asking the attendant in charge for a package of "Anargyros Cigarettes," whereupon the attendant took from a shelf a package of "Egyptian Nemesis" cigarettes, and handed them to affiant. . Upon this showing the court below made an order directing the defendant to show cause at a certain time and place why a preliminary injunction should not be granted as prayed for by the complainant, and in the meantime restraining the defendant from the commission of any of the acts complained of, requiring of the complainant the execution of a bond in the sum of $10,000.

In response to the order to show cause, the defendant filed its verified answer, together with a large number of affidavits. In its answer it admitted, among other things, that for more than 10 years immediately preceding March 30, 1900, S. Anargyros was engaged in the business of manufacturing and selling cigarettes, and carrying on that business in the name of S. Anargyros in the city of New York, and that all of the cigarettes manufactured and sold by him bore his name, and were packed and inclosed in packages and boxes which were marked and bore that name, but denies that the name "S. Anargyros" was used as a sign of quality of the cigarettes so marked, or to indicate the ownership or origin thereof as a product of S. Anargyros, manufacturer, or to distinguish the said cigarettes from those of other manufacturers, and in that behalf the defendant avers that the said name "S. Anargyros" was used as a sign that said cigarettes were made under his personal supervision and from tobacco selected and blended by him personally, and that he was the manufacturer thereof, and in this way as a sign of quality, but that they were distinguished from cigarettes of other manufacturers chiefly by the brand "Egyptian Deities." The answer denies that the name "S. Anargyros" had become a valuable or integral part of the packages, boxes, or trade-marks in or under which the said cigarettes had been sold by the said S. Anargyros, except when said cigarettes were made under his personal supervision, and avers that the mere pecuniary value of the said name "S. Anargyros" was derived solely from his skill, knowledge, and experience in making the cigarettes. The defendant by its answer admits that said S. Anargyros continued to carry on business in the city of New York until the month of March, 1900; admits that in form he conveyed his entire interest in the said business, including the good will thereof, to the complainant, but avers that the complainant is another name under which the American Tobacco Company, a corporation, is doing business, and that said conveyance was in fact a conveyance to the said American Tobacco Company; denies that the name "S. Anargyros" is, or ever was, a trade-name or trade-mark; denies that the said name "S. Anargyros," or the exclusive or any right thereto, was conveyed to the complainant, and denies that it is the legal or equitable or any owner of the said name; denies that the complainant corporation was organized under the name "S. Anargyros" for the reason set out in the bill, and in that behalf "avers that said Anargyros sold his trade-name and trade-mark 'Egyptian Deities' and the right to manufacture the same, to the American Tobacco Company for the sum of four hundred and fifty thousand ($450,000) dollars, and in consideration of said purchase agreed with said American Tobacco Company that he, S. Anargyros, would retire from the tobacco business; that in order to deceive and mislead the public and induce it to believe that the cigarettes manufactured and sold by it were made under the supervision of said S. Anargyros, are [an] individual," and that he was still engaged in business and competing with the American Tobacco Company, it organized the complainant under the name of S. Anargyros; that the complainant is capitalized at $650,000, but that only $450,000 of the stock was issued, all of which was transferred to the American Tobacco Company, and that its officers and stockholders were placed in charge of the said business;

under the name of S. Anargyros, and that it has ever since been, and still is. representing to the public that the said S. Anargyros is an independent manufacturer and its competitor. The answer admits that the name "S. Anargyros" was and is placed upon the packages and boxes containing the cigarettes manufactured and sold by the complainant, and avers that all Turkish and Egyptian cigarettes, and the packages and boxes containing the same, are similarly marked with the name of the manufacturer thereof, and that the name "S. Anargyros" was valuable during the time that the "Egyptian Deities" were made by and under the personal supervision of that individual as indicating that they were made from tobacco selected and blended by him, and that the name "S. Anargyros," ever since the aforesaid conveyance from him, has been used by the American Tobacco Company to deceive and mislead the public into believing that the said S. Anargyros is still selecting and blending the tobacco from which the cigarettes are made, when as a matter of fact the said S. Anargyros has been for more than 10 years last past a resident and citizen of Greece.

The answer denies that any of the cigarettes mentioned in the bill have been at any of the times therein mentioned known throughout the markets of the world, or at any place, as "Anargyros Cigarettes," or by the name "S. Anargyros," although it admits that the last-mentioned name was upon them and each of them. It avers that the said S. Anargyros made, manufactured, and sold "Egyptian Deities" cigarettes under that brand and under no other brand, and that he made and manufactured no other cigarettes. The answer admits that the cigarettes known to the trade and public as "Egyptian Deities," and so marked and sold, were of a superior quality, and achieved a great and valuable reputation throughout the world during the time they were manufactured by the individual S. Anargyros, and that such reputation is of value to the complainant in its business, and admits that the said business has been built up and extended by said reputation, and is dependent for its profitable continuation upon the reputation so attached to the said cigarettes by the use of the name "S. Anargyros," and denies that the said cigarettes were known or sold under any trade or other name than "Egyptian Deities," and denies that the name "S. Anargyros" is a trade-name or trade-mark. It avers that the American Tobacco Company sought to profit by the reputation due solely to the personal qualities of the said S. Anargyros, and has represented, and does still represent, to the public that the cigarettes sold under the brands of the complainant set out in the bill were manufactured by, and under the supervision of, S. Anargyros, when in truth they were not, and are inferior to those made by him. The answer admits the manufacture and sale by the defendant of cigarettes under the brands "Egyptian Nemesis" and "Turkish Pets," upon each of which are printed "Anargyros & Co," but denies that the same are in simulation or imitation of the name "S. Anargyros," or of any part of the complainant's brands.

The answer further alleges that the American Tobacco Company is a corporation capitalized at $132,000,000, with its offices and principal place of business at No. 111 Fifth avenue, New York City, where the complainant also has its principal place of business; that the American Tobacco Company is a combination of capital, operating under a corporate name, for the purposes of controlling the production, manufacture, sale, and price of tobacco, cigars, and cigarettes in the United States, and of preventing any competition in such production, manufacture, sale, and price, and is seeking to monopolize and is gradually monopolizing the tobacco trade, and the production, manufacture, and sale of tobacco, cigars, and cigarettes in the United States, and is commonly known as the "Tobacco Trust"; that, to escape the force of the decisions of the courts relating to trusts, it operates by incorporating its competitor under his trade-name, and acquires all the capital stock, and thereby the control thereof, and then continues to carry on the business under such name, in apparent competition with itself; that in this manner it began about 1891 to acquire control of all competitors in the tobacco, cigar, and cigarette business, for the purpose of securing a monopoly of the said business, and to hinder and restrain the trade and commerce in tobacco, cigars,

and cigarettes among the several states and territories of the United States, and with foreign nations; that in some instances it has paid exorbitant prices for the competitor acquired, and in others it destroyed the value of his business by reducing prices below actual cost; that in nearly every instance it has either before or after purchase incorporated the competitor, absorbed and acquired all its capital stock, or a majority thereof, and, with some of its stockholders or directors as officers of such corporation, carried on the old business under the old name, holding out to the public that the original owner was still carrying on his business independently of the American Tobacco Company; that it concealed and still conceals, its ownership of such controlled companies, and permitted, and still permits, them to advertise and hold themselves out as independent companies, intending thereby to deceive and mislead and defraud, and in fact deceiving, misleading, and defrauding, the public, and thereby effectually crippling existing competitors, and keeping out newcomers; that in this way, and by said means, and for said purposes, besides the business of S. Anargyros it acquired and carried on, and still carries on, under the original names of the businesses acquired, the business good will of the following former independent competitors: John Bollman Company, a corporation; Monopoly Tobacco Works, a corporation; The United Cigar Stores Company, a corporation; Imperial Tobacco Company, a corporation; British-American Tobacco Company, a corporation; American Cigar Company, a corporation; T. L. Vaugh & Co., a corporation; A. J. Reynolds Tobacco Company, a corporation; Blackwell's Durham Tobacco Company, a corporation; Wells-Whitehead Tobacco Company; and about 100 others; that in most of the above-mentioned companies are included several minor formerly independent dealers and competitors; that in nearly every one of the companies above named their officers are officers, directors, or stockholders of the American Tobacco Company; that each and every thereof has a different corporate name under and by which the said American Tobacco Company is doing business in violation of the act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and in violation of the act of the Legislature of the state of California entitled "An act to define trusts and to provide for criminal penalties and civil damages, and punishment of corporations, persons, firms and associations, or persons connected with them, and to promote free competition in commerce and all classes of business in this state," approved March 23, 1907 (St. 1907, p. 984, c. 530); that the present suit was begun, and is being carried on, in the name of the complainant by the said American Tobacco Company, which is supplying the money needed in its prosecution, and the securities on complainant's bond, all in furtherance of its alleged illegal and unlawful purpose, and to rid itself of the competition of the defendant, and for no other purpose; that, when the individual S. Anargyros sold to the said American Tobacco Company his business and plant, that company undertook to organize the complainant, and to adopt the name "S. Anargyros," which organization the defendant alleges is a fraud on the public and the courts; that the said American Tobacco Company selected certain of its stockholders and officers to represent it as stockholders of the complainant corporation, which they did, but that the only money paid in was that contributed by the American Tobacco Company, and that the president of the complainant corporation was, and still is, one of the vice presidents of the American Tobacco Company, and at its request is pressing the present suit.

The affidavit of George Anargyros is to the effect that he is, and ever since its incorporation has been, secretary of the defendant company, which was incorporated under the laws of California by Theodore Elcopoles, Theodore Rongopoluous, and the affiant, and that those three incorporators, with John Anargyros, are the only stockholders of the defendant company, each of them owning one-fourth thereof. This affidavit, after setting out the amount of money paid into the defendant's business by its stockholders, the capacity of its plant, the extent of its business, its solvency and ability to answer for any damages the complainant may recover, and the destruction of its busi-

ness necessarily to result from the granting of the injunction sought, sets out that John Anargyros and the affiant were born in Greece, and there learned and pursued for years the trade of making the so-called Turkish and Egyptian cigarettes; that later they came to the United States, and with the individual S. Anargyros, and on their own account, manufactured such cigarettes in the city of New York, until and after the business of S. Anargyros was absorbed, in the manner already stated, by the American Tobacco Company; that after such absorption the affiant was employed for a time by the complainant to superintend the making of the said cigarettes; that the manufacture and sale of Egyptian and Turkish cigarettes is the only trade or business that John Anargyros or the affiant ever followed; that "Turkish" and "Egyptian" are generic names or terms applied to all cigarettes commonly and generally known as Turkish or Egyptian cigarettes, while the different cigarettes are distinguished one from the other by specific names or brands, which names or brands are selected by the manufacturer, and, with a symbol or sign gathered from Egyptian or Turkish history, constitute the trade-name or trade-mark of the particular cigarette; that the defendant manufactures "Egyptian Nemesis," "Turkish Pets," "Shabak," and "Corkers" cigarettes (the first two brands of which have been hereinbefore set out, and which are the only ones resembling the complainant's brands). The affidavit of George Anargyros further states that S. Anargyros never manufactured nor sold, nor superintended the manufacturing or selling of, the "Turkish Trophies," "Murad," "Mogul," nor "Windsor Castle" brands of cigarettes set out in the complainant's bill, on which cigarettes and the boxes containing the same the complainant places the fac simile signature "S. Anargyros"; that the affiant was associated with S. Anargyros prior to the sale of his business to the American Tobacco Company, and was for some time thereafter employed by the complainant; that during all of said times the cigarettes manufactured by the individual S. Anargyros were known to the trade and public only as "Egyptian Deities," and that the other cigarettes manufactured by the complainant were also known to the public and trade only by the respective names "Turkish Trophies," "Murad," "Mogul," and "Windsor Castle"; that the individual S. Anargyros, and later the complainant always advertised and sold the cigarettes by the brands, and never by the name of the manufacturer, and that none of them were ever known or advertised as "Anargyros Cigarettes"; that as late as March, 1906, the complainant advertised in Munsey's Magazine, which is freely circulated throughout the United States, the "Murad" cigarette, without the name "S. Anargyros" appearing in the advertisement, a copy of which advertisement is as follows:

That at other times and in other magazines it has similarly advertised, and that even at the present time it is advertising, "Murad Cigarettes" in the following magazines: Munsey's, Pearson's, McClure's, Theater, Cosmopolitan, and in other magazines, not as "Anargyros Cigarettes," but as "Murad Cigarettes" in large type, and the words "S. Anargyros, Manufacturer," appear in very small type at the end of the advertisement, as follows:

That at present the complainant is advertising in the place of business of the United Cigar Stores Company, a corporation owned by the stockholders of the complainant, and elsewhere, the "Egyptian Deities," made by the complainant, with large, attractive, and conspicuous signs, as follows:

"Nothing Like it was Ever Seen Before.
DEITIES.   25¢.
After Dinner Size
Cigarettes."

"DEITIES.
After Dinner Size.
Box of 10
25¢."

That the complainant's name is not attached to nor made any part of the said last-mentioned advertisement, nor of the said cigarettes advertised as "Anargyros Cigarettes."

The affidavit of George Anargyros further states that for years he and the individual S. Anargyros manufactured Turkish and Egyptian cigarettes in the city of New York, every one of which so manufactured was given a name and brand according to the blends of the tobacco used in its manufacture; that the cigarettes so manufactured were advertised, sold, and commonly known to the trade and the public as "Egyptian Deities"; that, in a similar manner, after the purchase by the American Tobacco Company as stated, the complainant made and sold to the public and trade cigarettes only by the brand as "Egyptian Deities," "Turkish Trophies," "Murad," "Mogul," or "Windsor Castle"; that prior to the alleged sale by S. Anargyros to the American Tobacco Company the latter required as a part of the consideration of the purchase price an agreement on the part of the said S. Anargyros never to trade in tobacco thereafter, and that on the completion of the said purchase, and in furtherance of its alleged purpose to secure a monopoly on the production and sale of cigarettes in the United States and elsewhere, the said American Tobacco Company closed the works and business of the said S. Anargyros and moved all property connected with the business formerly carried on by him to its factory, and there began the manufacture of cigarettes under the name of "S. Anargyros," under which name it manufactured, besides "Egyptian Deities," "Turkish Trophies," "Murad," "Mogul," and "Windsor Castle" cigarettes, although the said S. Anargyros never made nor sold any of the said brands except "Egyptian Deities"; that in furtherance of its alleged purpose, and to profit by the personal reputation and skill of the individual S. Anargyros, and to mislead the public into believing that the said individual was still making and superintending the making of its cigarettes, the said American Tobacco Company caused the complainant company to be incorporated, adopting the fac simile signature of S. Anargyros, and that the said American Tobacco Company thereupon began to manufacture, and ever since has manufactured, and still is manufacturing, cigarettes under the name "S. Anargyros," and accompanies each box of the said "Egyptian Deities" with a printed announcement, bearing the fac simile signature "S. Anargyros," in the following words:

"To the patrons of the 'Egyptian Deities' Cigarettes:

"You are hereby respectfully informed that every box of 'Genuine Egyptian Deities' bears the name 'S. Anargyros' printed in black letters diagonally across the top, and also contains this notice with the fac simile signature.   Beware of cheap imitations.

"Respectfully,                                                     S. Anargyros, New York.
"N. B.   All imitations will be prosecuted by law as heretofore."

And that accompanying every box of "Mogul" cigarettes is the printed announcement, bearing the fac simile signature of S. Anargyros, in the following words: "Mogul Egyptian Cigarettes.   A cigarette of exceptional merit, made of the choicest selections of superior Turkish tobacco skillfully blended. S. Anargyros, Manufacturer"—and that similar announcements accompany all cigarettes made by the complainant—all of which are intended to and do deceive the public and customers into believing that such cigarettes are made from tobacco selected by, and skillfully blended by, the individual S. Anargyros, whereas he is not, and never has been, connected with the complainant, and has not and is not selecting or blending the tobacco from which the said cigarettes are made, but that the said S. Anargyros left the United States

more than 10 years ago, during which time he has been, and now is, residing in Greece.

The affidavit of George Anargyros makes the same statements of fact that are set out in the answer, in respect to the acquiring by the American Tobacco Company of the competing businesses of the various corporations and individuals and companies named in the answer, and the operation of such businesses of the acquired companies, corporations, and individuals by the officers and stockholders of the American Tobacco Company, and for the purposes stated in the answer.

The affidavit of T. Francis is to the effect that on the 7th of January, 1908, he visited one of the cigar stores of the United Cigar Stores Company in San Francisco, and saw in the Sutter street window and in the Fillmore street window thereof a large placard, in a conspicuous place, bearing the following inscription:

"Nothing Like it was Ever Seen Before.
DEITIES. 25¢.
After Dinner Size
Cigarettes."

—and that in said store there was also a placard bearing the following inscription:

"DEITIES.
After Dinner Size.
Box of 10.
25¢."

The affidavits of W. W. Wieman and John S. Norris, filed on behalf of the defendant, put in issue the averments of the affidavit of R. A. Laherty filed in support of the bill. The affidavit of M. C. Aros put in issue the matters stated in the affidavit of E. C. Hull filed in support of the bill. The affidavit of Irving J. Mandell put in issue the matters stated in the affidavit of W. R. Elliott, Jr., filed in support of the bill. There were also filed on behalf of the defendant the affidavits of a large number of persons, many of whom were cigarette dealers in and about the city of San Francisco, and many of whom were purchasers of cigarettes, almost all of which affidavits are to the effect that the affiants never knew of any cigarettes known, or called for, as "Anargyros Cigarettes," but that, on the contrary, so far as their knowledge and observation go, the complainant's cigarettes referred to in the bill, are and always have been known, sold and purchased as "Egyptian Deities," "Turkish Trophies," "Murad," "Mogul," and "Windsor Castle" cigarettes, and that it is by similar trade-names that all Egyptian and Turkish cigarettes are known, sold, and purchased.

In reply to the defendant's showing upon the order to show cause, the complainant filed the affidavits of C. H. Schmidt, Thomas J. Devitt, Horace O'Rear, Joseph Michalitschke, Arthur Bachman, and Herbert L. Cook, to the effect that the cigarettes manufactured and sold by the complainant are generally known in the trade as "Anargyros cigarettes, or the products of S. Anargyros, complainant herein, manufacturer," and that the trade-name or trade-mark "S. Anargyros" has become and is recognized as one of the most valuable trade-names or trade-marks in the Turkish cigarette business. The complainant also offered in reply another affidavit of George W. Whitaker, in which that affiant stated, among other things, that shortly after the acquisition by the complainant of the business of S. Anargyros, the affiant was employed by the complainant as superintendent of its factory in New York, and that all of the cigarettes manufactured by the complainant during the time of his employment were made according to the blends originated by the said S. Anargyros, and by him communicated to complainant, and in exact conformity to the methods and practices formerly used by the said S. Anargyros; that the tobaccos used by the complainant in the manufacture of said cigarettes were the same in respect of grade, character, and quality as those formerly used by its predecessor S. Anargyros, and were selected by one Henry Strause, a recognized authority and expert in the selection and blending of cigarette tobacco, who was as experienced and proficient in such matters as the said assignor of the complainant, and that the said Strause continued to give his personal attention to the selection and blending of the tobaccos used by the

complainant in the manufacture of the cigarettes for several years, and until succeeded by other competent and experienced experts.

The last-mentioned affidavit of Whitaker, after referring to certain matters contained in the aforesaid affidavit of George Anargyros, further avers that the complainant invariably stated in its advertisements that the particular brands of cigarettes manufactured by it were manufactured by S. Anargyros, "with this exception, to-wit, that a certain brand of cigarettes manufactured by complainant, and known and designated as 'Murad Cigarettes,' were occasionally advertised under the name 'Allan Ramsay,' that said Allan Ramsay was a distinguished and recognized expert in the selection and blending of cigarette tobaccos, and was the inventor and originator of the blend employed in the manufacture of said last-named brand of cigarettes, and his name for this reason has appeared, and now appears, on each box or package containing said brand of cigarettes, but that the name of complainant appears on each of the same as the manufacturer of said brand of cigarettes, and the name S. Anargyros is, and always has been, imprinted in each cigarette of this brand manufactured by complainant; that the cigarettes manufactured by the complainant are generally known in the trade and among a large percentage of the purchasers thereof as Anargyros cigarettes or the products of S. Anargyros' manufacture, which said trade-mark or trade-name 'S. Anargyros' has become and is recognized as one of the, if not the, most valuable trade-mark or trade-name in the Turkish cigarette business."

Referring to the statement made in the affidavit of George Anargyros respecting the advertisement of the "Egyptian Deities" placed in the windows of the United Cigar Stores Company in San Francisco, the affiant Whitaker, in his reply affidavit, "avers the facts to be that said signs above referred to were prepared and exhibited as aforesaid without knowledge or consent, and that complainant in no manner participated in or authorized the preparation or use of said signs, and in this behalf this affiant says that certain signs of a similar character were prepared and exhibited under the direction and authority of complainant, for the purpose of advertising said brand of 'Egyptian Deities' cigarettes, which were in the form, words and figures following, to wit:

# S. ANARGYROS'
## FAMOUS CIGARETTES
# Egyptian
# DEITIES
# 10 FOR 20 CENTS

Lent & Humphrey and McElroy & Stetson, for appellant.
R. E. Houghton and Edward F. Houghton, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Looking at the case as made by the pleadings and affidavits, we think the most that can be fairly claimed for the complainant is that it is a doubtful one. Under such circumstances the preliminary injunction should have been denied, and the temporary restraining order vacated. There was not even an attempt made on behalf of the complainant to show the insolvency of the defendant, but, on the contrary, an affirmative showing on its part of its ability to respond in damages to the complainant in the event of its maintaining the suit. It is, as said by the Supreme Court of Georgia in Foster v. Blood Balm Co., 77 Ga. 216, 3 S. E. 286, "a grave matter to petrify, in an instant, a living business by a mere interlocutory order." The well-established rule in equity is that a preliminary injunction should not be granted in a doubtful case.

One of the uncontradicted statements of fact contained in the affidavit of George Anargyros is to the effect that the individual S. Anargyros never made or sold any cigarettes but "Egyptian Deities," and never made any of those after his sale to the complainant; that all the other cigarettes made and sold under the other brands sued upon originated with and were made by the complainant corporation, and that all of them were sold by it to the public as the product of the individual S. Anargyros. "Any one has an unquestionable right," said the Supreme Court in Medicine Co. v. Wood, 108 U. S. 222, 2 Sup. Ct. 439 (27 L. Ed. 706). "to affix to articles manufactured by him a mark or device not previously appropriated, to distinguish them from articles of the same general character manufactured or sold by others. He may thus notify the public of the origin of the article, and secure to himself the benefits of any particular excellence it may possess from the manner or materials of its manufacture. His trademark is both a sign of the quality of the article and an assurance to the public that it is the genuine product of his manufacture. It thus often becomes of great value to him, and in its exclusive use the court will protect him against attempts of others to pass off their products upon the public as his. This protection is afforded not only as a matter of justice to him, but to prevent imposition upon the public. Manufacturing Co. v. Trainer, 101 U. S. 51, 25 L. Ed. 993. The object of the trade-mark being to indicate, by its meaning or association, the origin or ownership of the article, it would seem that when a right to its use is transferred to others, either by act of the original manufacturer or by operation of law, the fact of transfer should be stated in connection with its use; otherwise, a deception would be practiced upon the public, and the very fraud accomplished, to prevent which courts of equity interfere to protect the exclusive right of the original manufacturer. If one affix to goods of his own manufacture signs or marks which indicate that they are the manufacture of others, he is deceiving the public, and attempting to pass upon them goods as possessing a quality and merit which another's skill has given to sim-

167 F.—49

ilar articles, and which his own manufacture does not possess in the estimation of purchasers."

In respect to the "Murad" brand, at least, the statements of the affiant Anargyros find some corroboration in the averments of the bill itself.

While we do not think final disposition of the case should be made in advance of a trial upon the merits, we are of the opinion that upon the showing made the court below should not have granted the preliminary injunction, and should have vacated the restraining order, leaving the rights of the parties to depend upon a trial upon the merits.

The order is reversed, with instructions to vacate the restraining order.